IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANA MORENO,

    *Plaintiff,*

    v.

JOHN MCHUGH,
*Secretary of the Army*

    *Defendant.*

Civil Action No.: ELH-10-2511

## MEMORANDUM OPINION

Ana Moreno, plaintiff, formerly worked for the United States Army's Child Development Center at Fort Meade, Maryland, where she was the Lead Child and Youth Program Assistant at the Child Development Center I ("CDC"). She was terminated on September 2, 2009, after an incident on February 26, 2009, in which a child was injured at the CDC. *See* Complaint and Demand for Jury Trial ("Compl.," ECF 1). Plaintiff initially challenged her termination through the negotiated grievance procedure available through her union. Before completing that process, Ms. Moreno filed an Equal Employment Opportunity ("EEO") complaint, which was dismissed in June 2010.

This suit followed. Ms. Moreno alleges two claims: (1) employment discrimination on the basis of race, color, and national origin, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and (2) employment discrimination on the basis of her "hearing impairment," in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq.*

John McHugh, Secretary of the Army, defendant, has filed a Motion to Dismiss or for Summary Judgment ("Motion," ECF 11), which plaintiff opposes.[1] *See* Plaintiff's Response to

---

[1] The defendant has appended numerous exhibits in support of the Motion. Plaintiff has submitted one exhibit with her opposition.

Defendant's Motion to Dismiss or for Summary Judgment ("Response" or "Resp.," ECF 19). The issues have been fully briefed, and the Court now rules pursuant to Local Rule 105.6, no hearing being necessary.

## Factual and Procedural Background[2]

Plaintiff, a Non-Appropriated Fund employee, was a Lead Child and Youth Program Assistant at the CDC in Fort Meade, Maryland. Her responsibilities as Lead Child and Youth Program Assistant included "making sure that the child care room was safe and running according to CDC's rules and regulations." Compl. ¶ 8. However, she did not have "direct supervisory responsibility for CDC employees." *Id.*

Maria Maricle, the Program Director of the CDC, was plaintiff's direct supervisor. *Id.* According to plaintiff, Maricle "often seemed displeased with Plaintiff's performance and demeaned her in front of parents and other co-workers, often for no apparent reason." *Id.* ¶ 9. To illustrate, plaintiff has recounted an incident in January 2009, in which a parent of one of the children in CDC's care "was asking questions about the care given a child." *Id.* ¶ 10. When plaintiff allegedly "attempted to respond to the parent's concerns, Maricle told the parent that Plaintiff did not have the right to say anything, that Plaintiff 'was just there to change diapers.'" *Id.* Plaintiff met "with Madeline Morey, Child Administrator, to discuss her concerns." *Id.* ¶ 11. She also confronted Maricle, who allegedly told her "that the parent may not have understood Plaintiff because Plaintiff is Mexican and speaks Spanish, and may have difficulty expressing herself." *Id.* ¶ 12.

On February 26, 2009, an "incident" occurred at the CDC, involving nine-month-old Christian T., one of the children in the CDC's care. The child "fell headfirst [sic] into an empty

---

[2] As discussed, *infra*, the Motion will be considered as a motion to dismiss for lack of subject matter jurisdiction. The material jurisdictional facts are not in dispute.

sink" while Stephanie Richards, another CDC employee, was changing his diaper. *Id.* ¶ 13; *see* Memorandum in Support of Defendant's Motion to Dismiss or for Summary Judgment ("Motion Memo.," ECF 11-1) 2. Although the child began to cry, plaintiff avers that she could not hear him because of her hearing impairment. Compl. ¶¶ 13-14. Further, plaintiff claims that "did not have direct supervisory authority over other employees," including Richards, "nor did she have primary caregiving responsibility for Christian."[3] *Id.* ¶ 14.

The incident was "captured" on a "surveillance video."[4] Motion Memo 2. Neither plaintiff nor Richards "immediately notified management" or the child's parent, despite Army policy and CDC training requiring immediate notification. Motion Memo. 2-3; Motion Exh. 7. Indeed, notification "did not occur until over two hours after the event." Motion Memo 3; *see* Motion Exh. 10 (the "Incident/Accident Form," stating that the incident occurred at 11:05 a.m. and that Maricle and the parent were notified at 1:10 p.m.). The "Incident/Accident Form" completed by Richards and plaintiff "indicated that ice was applied." Motion Memo. 3; *see* Motion Exh. 10. However, the video revealed that neither Richards nor plaintiff applied ice to the child's head,[5] despite CDC training to apply ice. *See* Motion Exh. 9; Motion Memo. 3.

According to plaintiff, "CDC referred the matter to the Anne Arundel County Department of Social Services ('DSS')." Compl. ¶ 14. On April 7, 2009, DSS "notified Plaintiff that she had been identified as a person responsible for indicated child neglect." *Id.* As discussed, *infra*, plaintiff challenged that determination.

---

[3] Although not material, defendant asserts that Richards, an assistant, was under plaintiff's "lead." Motion Memo. 2.

[4] The video was not included in the record.

[5] An undated "Memorandum for Record," written by Maricle, indicated that Christian had "2 bruises on his forehead" when Maricle checked on him after plaintiff informed her of the incident, a few hours later. Motion Exh. 14.

In the meantime, on or about June 16, 2009, plaintiff received a Notice of Proposed Separation from her employer. *See* Motion Exh. 8. Richards was also notified of a proposed separation. *See* Motion Exh. 18. The charges set forth in both notices were identical: (1) "Violation of regulations where safety of persons is endangered"; (2) "Failure to follow procedure where safety of persons is endangered"; and (3) "Lack of candor." Motion Memo. 3; *see* Motion Exhs. 8 & 18 (plaintiff's and Richards's notices, respectively). Plaintiff's Notice of Proposed Separation provided: "[Y]ou may answer this notice of proposed separation orally, in writing, or both not later than fifteen (15) days after your receipt of this memorandum. . . . You may contact Mr. Lonnie Howie, President, Union Local 1622, regarding representation in this matter." Motion Exh. 8.

At the time of the proposed separation, plaintiff enjoyed the benefits of a collective bargaining agreement ("CBA") between Fort Meade and the union, titled "Agreement Between Headquarters Fort George G. Meade and Local 1622 American Federation of Government Employees Covering Non-Appropriated Fund Employees at Fort Meade." Motion Memo. 4; *see* Motion Exh. 20. Article 15 of the CBA concerns the grievance procedure available to covered employees. Under the CBA, the negotiated grievance process has three "Steps." Step 1 is an oral attempt at settlement with the appropriate supervisor; Step 2 is a submission, in writing, to "the next level of supervision"; and Step 3 is another submission, in writing, sent to the Commander of Fort Meade. Motion Exh. 20, art. 15, § 10. Further, the CBA provides for arbitration if a "grievance is not satisfactorily settled at Step 3." *See id.* § 11.

Section 5 of Article 15 of the CBA is noteworthy. It provides:

Section 5. Appeal and Grievance Options: An aggrieved employee affected by discrimination, a removal or reduction in grade based on unacceptable performance, or adverse action may, at the employee's option, raise the matter

under an appellate procedure[6] or the negotiated grievance procedure, but not both. An employee shall be deemed to have exercised the option under this section only when the employee files a timely notice of appeal under the appellate procedure or files a timely grievance in writing under the negotiated grievance procedure.

With the assistance of Lonnie W. Howie, the union president, plaintiff pursued a grievance challenging her proposed termination; she responded orally and in writing, via memorandum dated July 10, 2009, to the Notice of Proposed Separation. Motion Memo. 4; *see* Motion Exh. 3 (written response). By memorandum dated September 2, 2009, Lida Payne, "Acting Coordinator" for "Child, Youth and School Services," sustained the charges against plaintiff and formally notified plaintiff of her separation. Motion Exh. 2; *see also* Motion Memo. 3. The memorandum provided: "You may file a Step 2 Grievance on this decision if filed within ten (10) days of the effective date of this action." Motion Exh. 2. According to the "Notification of Personnel Action," plaintiff's separation was effective as of September 2, 2009. Motion Exh. 1.

By letter dated September 3, 2009, plaintiff filed a Step 2 Grievance with Martha McClary, Director of the Directorate of Family and Morale, Welfare and Recreation, Fort George G. Meade. Motion Exh. 21. Plaintiff disputed the findings in Payne's decision and requested a "face to face meeting." *Id.*; *see* Motion Memo. 4. On or about August 13, 2009, McClary heard an oral presentation "on behalf of Ana Moreno in regard to her Step 2 grievance during a meeting that was attended by Ana Moreno, Lonnie W. Howie, Sr., Martha McClary, Craig Strambler (Non-appropriated fund management-employee relations specialist) and Todd Stottlemyer (Office of the Staff Judge Advocate)." Motion Memo. 4; *see* Motion Exh. 24. In addition, "management received an additional statement from Maria Maricle." Motion Memo. 4.

---

[6] As will be discussed, *infra,* the "appellate procedure" refers to the statutory remedies available to a plaintiff alleging discrimination. The parties do not argue that the grievance procedure was not available to plaintiff under the CBA.

By memorandum dated September 25, 2009, McClary sustained plaintiff's separation.[7]  Motion Exh. 23.

In the meantime, plaintiff also challenged DSS's finding of child neglect.[8]  Following a hearing conducted by a State of Maryland administrative law judge ("ALJ") on September 1, 2009, the ALJ reversed DSS's finding on October 2, 2009.  Compl. ¶ 15.  The ALJ stated that DSS had failed to prove that plaintiff "was Christian's caretaker, or that her omissions caused him harm or placed him at substantial risk of harm."  Resp. Exh. 1, at 13.  However, the ALJ noted, *id.* at 13:

> It is clear that [plaintiff] is . . . not a model employee.  On February 26, 2009, she abdicated many of her important responsibilities as a Lead Worker at the CDC. She then falsified reports and her testimony . . . . If the hearing in this matter was actually the personnel hearing to address [plaintiff's] workplace failures . . . , surely I would have recommended severe discipline . . . .

Plaintiff continued to seek redress via her union's negotiated grievance procedure.  By memorandum dated October 6, 2009, plaintiff filed a Step 3 Grievance with the garrison commander, Colonel Daniel L. Thomas, and submitted the ALJ's ruling, exonerating her of child neglect.  Motion Exh. 24.  After a meeting "held in the deputy garrison commander's office,"[9] at which "Ms. Moreno . . . , Mr. Howie, Mr. Riback,[10] [Deputy Installation Commander John M.] Moeller, Mr. Strambler, and Mr. Stottlemyer" were present, Moeller issued a letter dated November 16, 2009, sustaining the separation.  Motion Exh. 25; *see* Motion Memo. 5.  In closing, he noted:  "If you are not satisfied with my decision, you may elevate this issue by filing

---

[7] Plaintiff avers that McClary "informed" her of her decision on September 29, 2009. Compl. ¶ 16.  Although not material, the memorandum appears to be dated September 25, 2009. Motion Exh. 23.

[8] Defendant was not a party to these proceedings.  Resp. 6.

[9] The record does not reveal the date on which this meeting occurred.

[10] The record does not reflect Mr. Riback's position.

for arbitration in accordance with the . . . collective bargaining agreement." Motion Exh. 25. No arbitration request was ever made, however. Motion Memo. 5.

Instead, on November 15, 2009, plaintiff contacted the Fort Meade EEO office and lodged an informal complaint, asserting that her termination was based on her race and her hearing impairment. Motion Exh. 26. On December 16, 2009, plaintiff filed a Formal Complaint of Discrimination with the EEO. Motion Exh. 28. In the printed form for formal complaints, plaintiff alleged that she was removed because of her race and her disability. *Id.*; Motion Memo. 5. One question on the form asked: "Have the issues identified . . . been appealed to the Merit Systems Protection Board (MSPB) or filed under a union negotiated grievance procedure?" Motion Exh. 28. Plaintiff answered: "No." *Id.*

In a letter dated December 30, 2009, an EEO officer, on behalf of the Department of the Army, dismissed plaintiff's EEO complaint. Motion Exh. 29. The EEO officer reasoned that plaintiff's election to proceed by way of her union's negotiated grievance procedure foreclosed the pursuit of her claims of discrimination by way of an EEO complaint.[11] *Id.*; *see* Motion Memo. 5.

Through her union president, plaintiff appealed the dismissal to the EEO Commission ("EEOC"). Motion Exh. 30; *see* Motion Memo. 5. The EEOC affirmed the dismissal, on the ground that plaintiff's election to proceed by way of the grievance procedure under the CBA foreclosed her right to pursue an EEO action. *See* Motion Exh. 32. This suit followed.

**Discussion**

<u>I.</u>

---

[11] Defendant asserts that the EEO officer also noted that plaintiff's failure to contact the EEO office within 45 days of the alleged personnel action constituted grounds for dismissal. However, the only ground for dismissal explicitly mentioned in the letter (Motion Exh. 29) was plaintiff's election to proceed by way of the negotiated grievance procedure.

As noted, plaintiff has brought suit under Title VII and the Rehabilitation Act.

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  The EEOC "is empowered to enforce Title VII's ban on discrimination, and to create rules and regulations to further enforcement."  *Murchison v. Astrue*, 689 F. Supp. 2d 781 (D. Md. 2010) (citing 42 U.S.C. § 2000e-16(b)).

"Congress expanded Title VII's coverage in 1972 to include employees of federal executive agencies and other particular categories of federal employees."  *Bonds v. Leavitt*, 629 F.3d 369, 384 (4th Cir. 2011).[12]  With regard to federal employees, 42 U.S.C. § 2000e-16(a) provides:

> All personnel actions affecting employees or applicants for employment (except with regard to aliens employed outside the limits of the United States) in military departments as defined in section 102 of title 5, in executive agencies as defined in section 105 of title 5 (including employees and applicants for employment who are paid from nonappropriated funds), in the United States Postal Service and the Postal Rate Commission, in those units of the Government of the District of Columbia having positions in the competitive service, and in those units of the judicial branch of the Federal Government having positions in the competitive service, in the Smithsonian Institution, and in the Government Printing Office, the Government Accountability Office, and the Library of Congress shall be made free from any discrimination based on race, color, religion, sex, or national origin.

In cases brought under Title VII, § 2000e-16(c) "creates a private right of action for employment discrimination and vests the federal courts with jurisdiction over such actions."  *Perdue v. Roy Stone Transfer Corp.*, 690 F.2d 1091, 1092 (4th Cir. 1982); *see Murchison*, 689 F. Supp. 2d at 789.  "In providing aggrieved federal employees a private right of action in federal

---

[12] The Fourth Circuit also stated that it has "little doubt that Congress 'incorporated the protections against retaliation' afforded to private employees" into Title VII's coverage for federal employees.  *Bonds*, 629 F.3d at 384 (citation omitted).

court, however, the [1972 amendment to Title VII] requires that federal employees exhaust their administrative remedies prior to commencing such an action." *Pueschel v. United States*, 369 F.3d 345, 353 (4th Cir. 2004).

"The Rehabilitation Act prohibits federal agencies from discriminating against qualified employees based on a disability . . . ." *Figueroa v. Geithner*, 711 F. Supp. 2d 562, 569 (D. Md. 2010). Specifically, 29 U.S.C. § 794(a) provides, in part: "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." The Rehabilitation Act incorporates the "remedies, procedures, and rights" set forth under Title VII. *See* 29 U.S.C. § 794a(a)(1); *A Helping Hand, LLC v. Baltimore County, Maryland,* 515 F.3d 356, 362 (4th Cir. 2008). Although the Rehabilitation Act does not expressly provide for a private right of action, it is well established that private parties may sue to enforce it. *Pandazides v. Va. Bd. of Educ.*, 13 F.3d 823, 828 (4th Cir. 1994); *Davis v. Southeastern Cmty. Coll.*, 574 F.2d 1158, 1159 (4th Cir. 1978), *rev'd on other grounds*, 442 U.S. 397 (1979).

Notably, "[t]he Rehabilitation Act adopts [the] exhaustion requirement of Title VII." *Marshburn v. Postmaster General*, 678 F. Supp. 1182, 1184 (D. Md.), *aff'd*, 861 F.2d 265 (4th Cir. 1988). As a result, "administrative review . . . and compl[iance] with various administrative procedures" is "a prerequisite to . . . suit." *Figueroa*, 711 F. Supp. 2d at 569. Put another way, claims brought under the Rehabilitation Act or Title VII must comply with the condition precedent of administrative exhaustion. *Wilkinson v. Rumsfeld*, 100 Fed. App'x 155, 157 (4th Cir. 2004); *see also Vinieratos v. United States,* 939 F.2d 762, 772 (9th Cir. 1991) ("The law

requires an aggrieved federal employee to elect one exclusive administrative remedy and to exhaust whatever remedy he chooses.").

The Supreme Court addressed the rationale for the administrative exhaustion doctrine in *Weinberger v. Salfi*, 422 U.S. 749, 765 (1975), stating:

> Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review.

A plaintiff's failure to exhaust administrative remedies deprives the court of subject matter jurisdiction over a plaintiff's claim. *See Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009); *see also Atkinson-Bush v. Balt. Wash. Med. Ctr., Inc.*, No. L-10-2350, 2011 U.S. Dist. LEXIS 57078, at *4 (D. Md. May 25, 2011) ("Failure by the plaintiff to exhaust administrative remedies deprives the Court of subject matter jurisdiction over the claim."). Chief Judge Chasanow said in *Kim v. Potter*, No. DKC 09-2973, 2010 U.S. Dist. LEXIS 54619, at *12 (D. Md. June 2, 2010), *aff'd*, No. 10-1737, 2011 U.S. App. LEXIS 4886 (4th Cir. 2011): "Failure by the employee to exhaust administrative remedies concerning a Title VII or Rehabilitation Act claim deprives the federal courts of subject matter jurisdiction over the claim."

However, there is a distinction between exhaustion of administrative remedies and the untimeliness of filings in pursuit of administrative remedies. *See Brown v. McKesson Bioservs. Corp.*, No. DKC 05-0730, 2006 U.S. Dist. LEXIS 9774, at *3 (D. Md. Mar. 10, 2006) ("[A] failure to exhaust administrative remedies based on *untimely filings* is not an issue of subject matter jurisdiction . . . ." (emphasis added)); *see also Bland v. Fairfax Cnty.*, No. 1:10cv1030 (JCC/JFA), 2011 U.S. Dist. LEXIS 70206, at *3 (E.D. Va. June 29, 2011) ("'[F]ailure to

exhaust' arguments in Title VII cases are to be distinguished from the situation where a specific charge of discrimination is filed with the EEOC, but it is allegedly untimely because the event occurred more than 300 days before the date the charge was filed.'  Significantly, 'filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that like a statute of limitations, is subject to waiver, estoppel, and equitable tolling.'" (citations omitted)).  The former will serve as a bar to subject matter jurisdiction, *Jones*, 551 F.3d at 300 & n.2, but the latter will not, and "is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982); *cf. Henderson v. Shinseki*, 562 U.S. ___, 131 S. Ct. 1197, 1203 (2011) ("Among the types of rules that should not be described as jurisdictional are what we have called 'claim-processing rules.'  These are rules that seek to promote the orderly progress of litigation by requiring that the parties take certain procedural steps at certain specified times.").

Defendant's Motion essentially presents two primary arguments pertaining to plaintiff's pursuit of her administrative remedies:  (1) plaintiff is bound by her election to pursue a negotiated grievance process, which she did not fully exhaust; and (2) in any event, she did not seek EEO counseling within the requisite 45-day time limit.  The Court will treat defendant's first argument as a motion to dismiss for lack of subject matter jurisdiction under FED. R. CIV. P. 12(b)(1), because it concerns administrative exhaustion generally, not an issue of timely compliance with filing deadlines.[13]  *See, e.g.*, *Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 777 (D. Md. 2010) (construing a motion brought pursuant to 12(b)(6) as a motion brought pursuant to 12(b)(1) for the purpose of the administrative exhaustion argument).

[13] Defendant's second administrative exhaustion argument pertains to a claim-processing timeliness requirement.  However, as the Court concludes that plaintiff did not exhaust her administrative remedies, and that the Court does not have subject matter jurisdiction over her claim, the Court will not address this alternative argument.

Because subject matter jurisdiction is a prerequisite to the pursuit of a claim in federal court, defendant's jurisdictional argument will be considered first.

## II.

"It is well established that before a federal court can decide the merits of a claim, the claim must invoke the jurisdiction of the court." *Miller v. Brown*, 462 F.3d 312, 316 (4th Cir. 2006). FED. R. CIV. P. 12(b)(1) governs motions to dismiss for lack of subject matter jurisdiction. *See Khoury v. Meserve*, 628 F. Supp. 2d 600, 606 (D. Md. 2003), *aff'd*, 85 Fed. App'x 960 (4th Cir. 2004). "[A] motion to dismiss under Rule 12(b)(1) is nonwaivable and may be brought at any time--even on appeal--regardless of whether a litigant raised the issue in an initial pleading." *Sucampo Pharms., Inc. v. Astellas Pharma, Inc.*, 471 F.3d 544, 548 (4th Cir. 2006); *see* FED. R. CIV. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

When a defendant challenges subject matter jurisdiction, the plaintiff bears the burden of proving that subject matter jurisdiction is proper. *See Evans v. B.F. Perkins Co., a Div. of Standex Int'l Corp.*, 166 F.3d 642, 647 (4th Cir. 1999); *see also Ferdinand-Davenport*, 742 F. Supp. 2d at 777; *Khoury*, 268 F. Supp. 2d at 606. In ruling on a motion under FED. R. CIV. P. 12(b)(1), the court "should 'regard the pleadings as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.'" *Ferdinand-Davenport*, 742 F. Supp. 2d at 777 (quoting *Evans*, 166 F.3d at 647); *see also Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991), *cert. denied*, 503 U.S. 984 (1992). The court should grant a Rule 12(b)(1) motion "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law." *Evans*, 166 F.3d at 647.

A plaintiff who is a member of a union covered under the Federal Service Labor-Management Relations Act ("FSLMRA"),[14] 5 U.S.C. § 7101 *et seq.*, may pursue a grievance procedure that is available under an applicable collective bargaining agreement.[15] The FSLMRA "establishes a comprehensive federal regulatory scheme for collective bargaining between federal employers and their employees." *U.S. Dep't of the Interior v. Fed. Labor Rels. Auth.*, 132 F.3d 157, 158 (4th Cir. 1997), *vacated, Nat'l Fed'n of Fed. Emps., Local 1309 v. Dep't of the Interior*, 526 U.S. 86 (1999). Among other things, the FSLMRA "requires any collective-bargaining agreement between a federal agency and a union to provide for a grievance procedure and binding arbitration for the resolution of disputes arising under the agreement." *Cornelius v. Nutt*, 472 U.S. 648, 652 (1985) (citing 5 U.S.C. §§ 7121(a) & (b)).

An employee who elects to pursue the grievance process under a collective bargaining agreement must exhaust that process before filing suit. *Trent v. Bolger*, 837 F.2d 657, 659 (4th Cir. 1988) (citing *Clayton v. Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am.*, 451 U.S. 679, 689 (1981)); *see also Williams v. Int'l Longshoremen's Ass'n, Local No. 333*, No. RDB-06-1943, 2007 U.S. Dist. LEXIS 88281, at *22 (D. Md. Nov. 30, 2007).

Exhaustion of the negotiated grievance process generally includes referral of the grievance to arbitration and the appeal of the arbitration decision, either to the EEOC or the Merit Systems Protection Board ("MSPB"), "an independent, quasi-judicial federal

---

[14] The FSLMRA is contained in Title VII of the Civil Service Reform Act ("CSRA") of 1978, Pub. L. No. 95-454, 92 Stat. 1111 (codified as amended in scattered sections of 5 U.S.C.). The CSRA "comprehensively overhauled the civil service system" and "created a new framework for evaluating adverse personnel actions against [federal employees]." *Lindahl v. Office of Personnel Mgmt.*, 470 U.S. 768, 773-74 (1985).

[15] As noted, there is no dispute that a union grievance procedure was available, in general, to plaintiff for her discrimination claims.

administrative agency established to review civil service decisions." *McAdams v. Reno*, 64 F.3d 1137, 1141 (8th Cir. 1995). Section 7121(d) of the FSLMRA states, in part:

> Selection of the negotiated procedure in no manner prejudices the right of an aggrieved employee to request the Merit Systems Protection Board to review the final decision pursuant to section 7702 of this title in the case of any personnel action that could have been appealed to the Board, or, where applicable, to request the Equal Employment Opportunity Commission to review a final decision in any other matter involving a complaint of discrimination of the type prohibited by any law administered by the Equal Employment Opportunity Commission.

Whether the appeal is to the EEOC or to the MSPB depends on the circumstances, i.e., whether the case is "mixed" or "pure."[16] "[I]n a pure discrimination case, an employee who chooses the negotiated grievance procedure must appeal the arbitrator's award to the EEOC

---

[16] Under 29 C.F.R. § 1614.302(a)(1), a "mixed case" is defined as a "complaint of employment discrimination filed with a federal agency based on race, color, religion, sex, national origin, age, disability, or genetic information related to or stemming from an action that can be appealed to the" MSPB. It "may contain only an allegation of employment discrimination or it may contain additional allegations that the MSPB has jurisdiction to address." *Toyama v. Merit Sys. Prot. Bd.*, 481 F.3d 1361, 1364 (Fed. Cir. 2007); *see Briggs v. Dalton*, 984 F. Supp. 353, 354-55 (D. Md. 1997) ("Cases . . . in which the plaintiff alleges claims of discrimination and claims of prohibited personnel practices, not based on discrimination, are called 'mixed cases.'"). "Actions that can be appealed to the MSPB include, *inter alia*, removal from federal service, including retaliatory termination for protected whistle-blower activity." *Bonds, supra*, 629 F.3d at 378 (citing 5 U.S.C. §§ 1214(a)(3), 7512). A plaintiff with a "mixed case" has the statutory options of filing her complaint with her agency's EEO office or bringing a "'mixed case appeal' directly with the MSPB," but not both. *Bonds*, 629 F.3d at 378 (quoting *Butler v. West*, 164 F.3d 634, 638 (D.C. Cir. 1999)); *see* 5 U.S.C. § 7702; *see also* 29 C.F.R. § 1614.302(b) ("An aggrieved person may initially file a mixed case complaint with an agency pursuant to this part or an appeal on the same matter with the MSPB pursuant to 5 CFR 1201.151, but not both.").

In contrast, a "pure" discrimination case "involves claims of discrimination only." *Fernandez v. Chertoff*, 471 F.3d 45, 53 (2d Cir. 2006). A plaintiff bringing a "pure" discrimination complaint, and who wishes to pursue a statutory remedy, only has the statutory option of filing a complaint with her agency's EEO office. *Smith v. Jackson*, 539 F. Supp. 2d 116, 130 n.19 (D.C. Cir 2008) (stating that, for a "pure discrimination" claim, plaintiff's "avenue of appeal" is the EEOC); *see Fernandez*, 471 F.3d at 53 ("An aggrieved employee may pursue a 'pure' discrimination case in the first instance by filing a complaint with the EEO Office of his employing agency."); *Am. Fed'n Gov't Employees, Local 2052 v. Reno*, 992 F.2d 331, 333 (D.C. Cir. 1993) ("In a pure discrimination case, the statutory procedure consists of the EEO complaint format under 42 U.S.C. § 2000e-16.").

before bringing suit," but "in a mixed case, an employee must appeal the arbitrator's award to the MSPB before seeking judicial review." *Fernandez v. Chertoff,* 471 F.3d 45, 44 (2d Cir. 2006).

Alternatively, pursuant to § 7121(d) of the FSLMRA, a federal employee who suffers an adverse employment action, and who also believes that the adverse action was discriminatory, may pursue a claim pursuant to a "statutory procedure." Depending on the circumstances, the statutory procedure is a proceeding directly by way of either the EEO process or the MSPB. As noted, and of relevance here, a claimant who pursues a charge with the EEOC must exhaust that administrative remedy prior to filing suit. *See Crabill v. Charlotte Mecklenburg Bd. of Educ.,* No. 10-1539, 2011 U.S. App. LEXIS 8111, at *15 (4th Cir. 2011); *Davis v. Va. Commonwealth Univ.,* 180 F.3d 626, 628 n.3 (4th Cir. 1999); *see also* 42 U.S.C. § 2000e-5(e)(1); *id.* § 2000e-5(f)(1); *Franceschi v. U.S. Dep't of Veterans Affairs*, 514 F.3d 81, 85 (1st Cir. 2008) ("The administrative process begins with the filing of an administrative charge" and "[t]he EEOC must send the employee notice, in the form of what is known as a right-to-sue letter").

Section 7121(d) of the FSLMRA is particularly relevant to this case, because it makes clear that the employee who seeks to challenge his or her termination must choose one—and only one—of the options outlined above. It provides, in part (emphasis added):

> *An aggrieved employee affected by a prohibited personnel practice . . . which also falls under the coverage of the negotiated grievance procedure may raise the matter under a statutory procedure or the negotiated procedure, but not both.* An employee shall be deemed to have exercised his option under this subsection to raise the matter under either a statutory procedure or the negotiated procedure at such time as the employee timely initiates an action under the applicable statutory procedure or timely files a grievance in writing, in accordance with the provisions of the parties' negotiated procedure, whichever event occurs first.[17]

---

[17] The election requirement of 5 U.S.C. § 7121(d) applies to both "pure" and "mixed" discrimination complaints, although the statutory procedures differ. *See Toyama*, *supra,* 481 F.3d at 1364 ("Under the EEOC's regulations, separate procedures apply to a party presenting a mixed case complaint, as compared to a pure discrimination complaint.").

The federal sector EEO regulations appear at 29 C.F.R. part 1614.  Consistent with 5 U.S.C. § 7121(d), 29 C.F.R. § 1614.301(a) addresses the relationship of the EEO process and a negotiated grievance procedure, stating:

> When a person is employed by an agency subject to 5 U.S.C. 7121(d)[18] and is covered by a collective bargaining agreement that permits allegations of discrimination to be raised in a negotiated grievance procedure, a person wishing to file a complaint or a grievance on a matter of alleged employment discrimination must elect to raise the matter under either part 1614 [the EEO process] or the negotiated grievance procedure, but not both.

In sum, an employee covered by a collective bargaining agreement with an applicable grievance process may elect one of two options, but not both:  (1) she may file a grievance pursuant to her union's negotiated grievance; or (2) she may make a statutory election, by filing a formal EEO complaint or, in certain cases, a claims with the MSPB.  Notably, the employee must choose between the statutory or grievance process; the employee may not pursue both remedies.  5 U.S.C. § 7121(d); *see Vinieratos*, *supra*, 939 F.2d at 768.  And, the election between a statutory or a negotiated grievance procedure "is irrevocable."  *Vineratos*, 939 F.2d at 768.  This means that an employee is bound by her initial election.

An election to proceed under the EEO process "is indicated only by the filing of a written complaint."  29 C.F.R. § 1614.301(a).  The election is not triggered by the "pre-complaint process," such as the initial EEO counseling stage.  *Id.*; *see also id.* § 1614.105 (detailing the pre-complaint process).  Similarly, "[a]n election to proceed under a negotiated grievance procedure is indicated by the filing of a timely written grievance."  *Id.* § 1614.301(a).

As noted, once the employee has made her election, it is irrevocable; she cannot opt to pursue her claim via the other process.  *Id.*; *see* 5 U.S.C. § 7121(d).  Of import here, 29 C.F.R. § 1614.301(a) also indicates that the employee is bound by her election, even if the agency did

---

[18] The parties do not dispute that the Army is subject to 5 U.S.C. § 7121(d).

not advise her that the election is binding. It provides, in part: "An aggrieved employee who files a grievance with an agency whose negotiated agreement permits the acceptance of grievances which allege discrimination may not thereafter file a complaint on the same matter under this part 1614 *irrespective of whether the agency has informed the individual of the need to elect or of whether the grievance has raised an issue of discrimination*." (Emphasis added.)

IV.

Defendant maintains that plaintiff's election to challenge her termination via the negotiated grievance process constituted an irrevocable election that precluded her from later filing an EEO complaint. Because plaintiff failed to exhaust the grievance process, in that she did not pursue arbitration, defendant contends that Ms. Moreno is not entitled to litigate her claims in court. Motion Memo. 9; *see* Defendant's Reply Memorandum ("Reply," ECF 26) 3. Defendant insists that plaintiff was "put on notice" of her grievance and statutory rights "through regular training and posted materials," and that the CBA itself references the choice an employee must make between an "appellate procedure" and the "negotiated grievance procedure." Reply 4. In any event, argues defendant, "the failure of the Army to specifically suggest that Plaintiff file an EEO claim when her termination was proposed does not permit her to circumvent the applicable statutes and regulations." *Id.*

Plaintiff insists that her grievance election was not binding, as it was not an informed decision. Resp. 4. She asserts: "Plaintiff was <u>not</u> told that she also had the option of pursuing an EEO action, and that a decision to file a grievance constituted an irrevocable election of remedies." *Id.* Ms. Moreno also suggests that because she abandoned the grievance process before a "final determination" was made, she was entitled to pursue an EEO action. *Id.* at 4, 8. In addition, plaintiff contends that the ALJ's reversal of DSS's finding of neglect "precluded the

- 17 -

grievance authority from arriving at a contrary result." *Id.* at 5. Thus, she claims that "the grievance procedure did not provide a viable option," and so no election can be said to have occurred. *Id.*[19]

In my view, plaintiff's various arguments lack merit.

As noted, plaintiff complains that she was not informed of her mutually exclusive remedies as to the *negotiated grievance procedure* and the EEO process. *See* Resp. 4 ("Plaintiff was <u>not</u> told that she also had the option of pursuing an EEO action, and that a decision to file a grievance constituted an irrevocable election of remedies."). With regard to plaintiff's contention that the Army was obligated to inform her of her avenues of recourse, she cites the following cases: *Atanus v. Merit Sys. Prot. Bd.*, 434 F.3d 1324 (Fed. Cir.), *cert. denied*, 549 U.S. 889 (2006); *Miyai v. Dep't of Transp.*, 32 M.S.P.R. 15 (1986); *Johnson v. U.S. Dep't of Labor*, 26 M.S.P.R. 447 (1985); and *Blanshan v. Dep't of the Air Force*, 23 M.S.P.R. 84 (1984).

To be sure, the cases cited above discuss the concept of an informed election. However, they applied to a plaintiff's election between a negotiated grievance procedure and an *appeal to the MSPB,*[20] not the EEO process. *See, e.g.*, *Atanus*, 434 F.3d at 1327 ("[T]he agency expressly informed Atanus in its removal letter that she had the option to pursue a grievance procedure or appeal to the [MSPB], but not both. Although Atanus alleges that her election was not properly informed, that is not correct."); *Miyai*, 32 M.S.P.R. at 20 ("The agency in this case has not shown -- or even alleged -- that it ever notified the appellant of his right to file an appeal [to the MSPB]

---

[19] A sizable portion of plaintiff's Response attempts to contest findings made by the various decision makers in the grievance process as being in conflict with the ALJ's findings.

[20] The following matters require an election between an appeal to the MSPB or a negotiated grievance: matters covered under 5 U.S.C. § 4303 (reductions in grade and removals due to unacceptable performance) and 5 U.S.C. § 7512 (adverse actions such as removals, reductions in grade or pay, suspensions and furloughs). *See* 5 U.S.C. § 7121(e). Plaintiff does not allege that the Army failed to inform her of the mutually exclusive rights to appeal to the MSPB or to file an EEO complaint.

or of any limitations on that right."); *Johnson*, 26 M.S.P.R. at 450 ("Review of the specific . . . notice which appellant received indicates that she was informed that her only [MSPB] *appeal* right was in accordance with the agency's collective bargaining agreement." (emphasis added)); *Blanshan*, 23 M.S.P.R. at 86 ("Since appellant was reasonably misled by the agency's erroneous advise [sic], his filing of the grievance prior to appealing to the [MSPB] did not serve as an election . . . .").[21]

Because the statutory procedure at issue in the cases cited above was not the EEO process, the EEO regulations did not control. Thus, the unequivocal language in 29 C.F.R. § 1614.301(a), which applies only to a plaintiff's choice between an EEO process and a negotiated grievance procedure, was not relevant in the cases on which plaintiff relies.[22] As noted, according to 29 C.F.R. § 1614.301(a), an election between a negotiated grievance procedure and the EEO process will stand "*irrespective of whether the agency has informed the individual of the need to elect or of whether the grievance has raised an issue of discrimination.*" (Emphasis added).

In contrast to 29 C.F.R. § 1614.301(a), indicating that the agency's failure to inform an employee of the need to elect does not relieve the employee of the consequences of an election, the EEO regulations have been perfectly pellucid as to when an informed election *is* mandated. For instance, 29 C.F.R. § 1614.302(b), provides, in part:

> An aggrieved person may initially file a mixed case complaint with an agency
> [via the EEO process] or an appeal on the same matter with the MSPB pursuant to
> 5 CFR 1201.151, but not both. An agency *shall inform* every employee who is the

---

[21] One court noted that the reported MSPB cases never explained "the origin of the alleged requirement of an *informed* election." *Johnson v. Bowen*, No. 84 C 1874, 1989 WL 6489, at *2 (N.D. Ill. Jan. 24, 1989) (declining to follow *Miyai*, *Johnson*, and *Blanshan*, as to a plaintiff's election between the MSPB and his negotiated grievance procedure).

[22] The MSPB has its own regulatory scheme. *See* 5 C.F.R. part 1201 (regulations governing the practices and procedures for appeals to the MSPB).

- 19 -

subject of an action that is appealable to the MSPB and who has either orally or in writing raised the issue of discrimination during the processing of the action of the *right to file either a mixed case [EEO] complaint with the agency or to file a mixed case appeal with the MSPB*. The person *shall be advised* that he or she may not initially file both a mixed case complaint and an appeal on the same matter and that whichever is filed first shall be considered an election to proceed in that forum.

(Emphasis added.)

In *Haney v. Donovan*, No. 08-2658 JAR, 2010 U.S. Dist. LEXIS 32426 (D. Kan. Mar. 30, 2010) (unpublished), a plaintiff brought various employment discrimination claims against her former employer, the United States Department of Housing and Urban Development. *Id.* at *1. Because of her disability, the plaintiff had requested special accommodations for an overnight business trip. *Id.* at *20. But, "she was notified that, instead of traveling [on the trip], she was being reassigned from the Enforcement Branch of the Office of Fair Housing and Equal Opportunity, to the Intake/Assessment Branch." *Id.* She "believed this assignment was a retaliatory response to her request for an accommodation of her disability." *Id.* Therefore, she pursued the negotiated grievance procedure available to her as a bargaining unit employee. *Id.* At the second "Step" of the negotiated grievance procedure, however, "plaintiff notified management . . . that she did not intend to pursue her grievance any further but intended to pursue the matter . . . through the EEO complaint process." *Id.* at *21.

The EEO dismissed the claims as to plaintiff's reassignment, stating that she had elected to proceed through the negotiated grievance procedure. *Id.* at *25. Plaintiff then filed suit, contending, *inter alia*, that she had not been advised that her options under the EEO process and the negotiated grievance process were mutually exclusive. *Id.* at *42. Citing the terms of the

applicable collective bargaining agreement,[23] as well as 29 C.F.R. § 1614.301(a), the court rejected the plaintiff's argument, concluding that her election was irrevocable. *Id.* at *42.

The Northern District of Illinois also considered the issue in *Steadman v. Whitman*, No. 01 C 6699, 2002 U.S. Dist. LEXIS 21322 (N.D. Ill. Nov. 1, 2002) (unpublished). The plaintiff in that case was a former Environmental Protection Agency ("EPA") employee who was terminated for alleged misconduct. *Id.* at *6-7. The plaintiff challenged his termination and alleged discrimination through his union's negotiated grievance procedure. *Id.* at *7. However, he abandoned the grievance procedure after the second "Step," and filed an EEO complaint. *Id.* at *14. A "clerical error" delayed the processing of his EEO complaint, so it was never formally investigated or denied. *Id.* at *15-16. But, according to an affidavit submitted by an EEO specialist, the "appropriate action" would have been dismissal because plaintiff had elected to proceed by the negotiated grievance procedure available to him. *Id.* at *16.

Upon filing suit in the district court, the plaintiff contended that "it was his intention to pursue EEO procedures and that he believed the grievance procedure was part of the EEO procedures." *Id.* at *21. But, as in *Haney*, the court cited 29 C.F.R. § 1614.301(a) for the proposition that "the EPA was not obliged to make it clear to plaintiff that his filing of a grievance would act as an election overriding any informal EEO proceeding that had been

---

[23] Specifically, the collective bargaining agreement in *Haney* contained language that does not appear in the CBA, i.e., that "an EEO Counselor is 'responsible for informing the employee of his/her options in relation to alternative procedures,'" but that "'[t]he inadvertent failure of the Counselor to inform the employee of his/her options, in no way diminishes the employee's responsibility to make an election of procedures or extends the time limits for filing a grievance or a complaint.'" *Id.* at *42 (alteration in original). The court noted that, despite the affirmative obligation placed on the EEO counselor, the collective bargaining agreement was nevertheless "consistent with" 29 C.F.R. § 1614.301(a), because the employee's election would stand irrespective of any failure on the part of the EEO counselor to comply with her obligation under the collective bargaining agreement. *Id.* at *42-43. It concluded that, because the collective bargaining agreement was consistent with applicable federal regulations, plaintiff's election, although uninformed, was binding. *Id.*

previously initiated." *Id.* at *22. It concluded that the plaintiff, having elected the negotiated grievance procedure and having failed to pursue to completion, had failed to exhaust his administrative remedies. *Id.* at *25.

Based on the foregoing, I am satisfied that the Army was not required to inform plaintiff of the mutual exclusivity of the EEO and negotiated grievance processes, or that her election was binding. Plaintiff elected to pursue her claim via the negotiated grievance procedure. That election controls, "irrespective of whether the [Army] . . . informed [her] of the need to elect or of whether the grievance has raised an issue of discrimination," as long as the claims both concerned the same "matter." 29 C.F.R. § 1614.301(a).

"Every court that has considered the issue has concluded that the word 'matter' in 5 U.S.C. § 7121 and 29 C.F.R. § 1614.301 refers to the conduct underlying a plaintiff's claim, as opposed to the legal allegations in the claim." *Wright v. Stone*, No. 02 Civ. 7615 (TPG), 2004 U.S. Dist. LEXIS 17048, at *13 (S.D.N.Y. Aug. 25, 2004); *see*, *e.g.*, *Rosell v. Wood*, 357 F. Supp. 2d 123, 129 (D.D.C. 2004) ("The term 'matter' in 5 U.S.C. § 7121(d) and 29 C.F.R. § 1614.301(a) has been interpreted to refer to the 'underlying [government] action' that gives rise to the grievance or complaint." (quoting *Bonner v. Merit Sys. Prot. Bd.*, 781 F.2d 202, 204 (Fed. Cir. 1986)); *O'Dwyer v. Snow*, No. 00 Civ. 8918, 2004 U.S. Dist. LEXIS 3528, at *27 (S.D.N.Y. Mar. 10, 2004) (same); *Guerra v. Cuomo*, 176 F.3d 547, 550-51 (D.C. Cir. 1999) (stating that "courts have tended to construe the term 'matter' to encompass more than a legal claim and instead to encompass the 'underlying action,'" and that, "whatever the scope of the definition of the term 'matter,' minimally it must have some bearing to the underlying employment action and the rights at issue, as distinct from being governed solely by the remedy sought"); *Macy v. Dalton*, 853 F. Supp. 350, 353 (E.D. Cal. 1994) ("Thus, in the context of this

case, the 'matter' to which § 7121(d) refers is not plaintiffs' discrimination claim, but rather is plaintiffs' termination . . . .").

Here, the "matter" is plainly the Army's termination of plaintiff's employment.  It is undisputed that both the grievance and the EEO complaint concerned the circumstances surrounding plaintiff's termination.  Moreover, as indicated, it is undisputed that plaintiff filed her Step 2 Grievance before she filed her EEO complaint.  Therefore, plaintiff's election stands, regardless of whether, at the time of her election, the agency had informed her "of the need to elect" or "whether the grievance has raised an issue of discrimination."  29 C.F.R. § 1614.301(a); *see Macy*, *supra*, 853 F. Supp. at 353-54 (remarking that, while § 7121(d) "does not specifically address the situation in which an employee first files a grievance through the negotiated procedure but does not expressly raise a discrimination claim," the EEO regulations nevertheless make clear that, "if an employee chooses the grievance route [in challenging an employment action], she may not thereafter file an EEO complaint regardless of whether her grievance alleged unlawful discrimination"); *see also Wright*, 2004 U.S. Dist. LEXIS 17048, at *15-16 (where plaintiff contended that she did not know of any discriminatory grounds until her grievance process was under way, the court nevertheless stated:  "Plaintiff's argument ignores the plain language of § 1614.301, which states that a complaint pertaining to the same matter grieved through union proceedings may not subsequently be filed with the EEOC *regardless of* whether the grievance actually raised the issue of discrimination.").  It is simply not the case, as plaintiff avers, that she could abandon the negotiated grievance procedure to pursue an EEO complaint alleging discrimination relative to the same "matter," i.e., her employment termination.

As plaintiff elected the grievance process, she was required to exhaust it before filing suit. This she failed to do, because she did not pursue her grievance to arbitration. The CBA states, in part: "If [a] grievance is not satisfactorily settled at Step 3, the Union or the Employer may refer the matter to arbitration under Article 17 of this Agreement." Motion Exh. 20, art. 15, § 11. The Step 3 decision issued by the Deputy Installation Commander also referred to arbitration available under the CBA. Motion Exh. 25. Because plaintiff elected to pursue her claim via the negotiated grievance procedure, but did not pursue it to its conclusion, she failed to exhaust her remedies. It follows that the Court lacks subject matter jurisdiction over her claims.

Additionally, it strains credulity to suggest that the ALJ's decision on the issue of *child neglect* would have the effect of collaterally estopping the grievance process from sustaining plaintiff's termination based on her purported failure to abide by internal policies and procedures.[24] Moreover, the ALJ very clearly distinguished the decision that plaintiff was not responsible for indicated neglect from the question of plaintiff's termination, stating: "If the hearing in this matter was actually the personnel hearing to address [plaintiff's] workplace failures . . ., surely I would have recommended severe discipline . . . . *However, the hearing was to determine if a child was neglected* and, if so, whether [plaintiff] was the neglector." Resp. Exh. 1, at 13 (emphasis added). As the issue of plaintiff's termination from the employment was not before the ALJ, the negotiated grievance procedure remained a viable option for plaintiff to challenge her termination. The ALJ's findings on the issue of *child neglect* were not preclusive of any findings on whether her *termination* was proper. And, as noted by defendant, plaintiff's Step 3 grievance was filed <u>after</u> the hearing before the ALJ; plaintiff "clearly did not believe that the grievance process would be futile at that time." Reply 4.

---

[24] As noted, plaintiff was charged with: (1) "Violation of regulations where safety of persons is endangered"; (2) "Failure to follow procedure where safety of persons is endangered"; and (3) "Lack of candor." Motion Memo. 3.

**Conclusion**

For the reasons outlined above, the Court lacks subject matter jurisdiction to consider the merits of plaintiff's complaint. Accordingly, the Court will grant defendant's Motion, and the case will be dismissed, with prejudice. A separate Order consistent with this Opinion will follow.

Date: July 14, 2011                                    /s/_____
                                                        Ellen Lipton Hollander
                                                        United States District Judge